In the

# United States Court of Appeals
## For the Seventh Circuit

No. 11-1957

GEORGE MCREYNOLDS, et al.,

*Plaintiffs-Appellants,*

*v.*

MERRILL LYNCH & CO., INC., et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 6105—**Robert W. Gettleman**, *Judge.*

ARGUED OCTOBER 24, 2011—DECIDED SEPTEMBER 11, 2012

Before SYKES and TINDER, *Circuit Judges*, and DEGUILIO, *District Judge.*[*]

SYKES, *Circuit Judge*. In 2005 a group of brokers at Merrill Lynch sued the firm under 42 U.S.C. § 1981 and Title VII raising various claims of racial discrimination and seeking to litigate the claims as a class. Among

---

[*] The Honorable Jon E. DeGuilio, United States District Court for the Northern District of Indiana, sitting by designation.

other things, they alleged that the firm's "teaming" and account-distribution policies had the effect of steering black brokers away from the most lucrative assignments and thus prevented them from earning compensation comparable to white brokers. That litigation is ongoing. *See McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482 (7th Cir. 2012) (reversing the denial of class certification).

Three years after that suit was filed, Bank of America acquired Merrill Lynch, and the companies introduced a retention-incentive program that would pay bonuses to Merrill Lynch brokers corresponding to their previous levels of production. In response a similar group of brokers filed a second class-action suit, this time against both Merrill Lynch and Bank of America. The new suit again invoked § 1981 and Title VII, but focused specifically on the retention program. The plaintiffs alleged that the bonuses incorporated previous production levels that were the product of Merrill Lynch's underlying discriminatory policies. The defendants moved to dismiss for failure to state a claim, arguing that the retention program was a race-neutral compensation system keyed to quality of production and was therefore exempt from challenge under § 703(h) of Title VII (codified at 42 U.S.C. § 2000e-2(h)).

The district court granted the motion. The court first held that the retention program qualified as a production-based compensation system within the meaning of the § 703(h) exemption. As such, the program was protected from challenge unless it was adopted with "the

intention to discriminate because of race." 42 U.S.C. § 2000e-2(h). The court then held that the complaint's allegations of discriminatory intent were conclusory, akin to those rejected by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Finally, to the extent that the allegations pertained to the underlying employment practices at Merrill Lynch—the "inputs" that produced the bonuses—the court held that they duplicated the claims in the earlier, ongoing suit. These holdings resolved the § 1981 claim as well, so the court dismissed the entire case with prejudice.

We affirm. As described in the complaint, the retention program awarded bonuses based on a race-neutral assessment of a broker's prior level of production, which suffices to protect the program under § 703(h) unless it was adopted with intent to discriminate. It is not enough to allege, as the complaint does, that the bonuses incorporated the past discriminatory *effects* of Merrill Lynch's underlying employment practices. *See Am. Tobacco Co. v. Patterson*, 456 U.S. 63 (1982); *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977). The disparate impact of those employment practices is the subject of the first lawsuit, and if proven, will be remedied there. With respect to the retention program itself, the complaint alleges discriminatory intent in a wholly conclusory fashion, so dismissal was proper under the pleading standards announced in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and amplified in *Iqbal*.

## I. Background

Merrill Lynch & Co. and Merrill Lynch, Pierce, Fenner & Smith, Inc. (jointly, "Merrill Lynch"), are financial-services firms engaged in the retail and institutional sale of various financial products. At the time the present case was filed, Merrill Lynch was the largest retail brokerage firm in the country, employing over 15,000 financial advisors nationwide.[1] These brokers sell the company's financial products and services, and they are paid according to a firm-wide grid formula that applies different commission rates based on the broker's level of production. While the formula is intricate, the basic principle is that a broker's compensation is based on "production credits"—in essence, commissions earned on client assets managed by the broker. The compensation formula is neutral with respect to race.

In 2005 George McReynolds, a black broker, filed a class-action discrimination lawsuit against Merrill Lynch in federal court in the Northern District of Illinois. *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 05-cv-6583 (N.D. Ill. filed Nov. 18, 2005) ("*McReynolds I*"). The suit was originally brought by McReynolds as the lone named plaintiff and alleged claims of racial discrimination under 42 U.S.C. § 1981, but it was amended in November 2006 to add 16 additional named plaintiffs and a discrimination claim under Title VII,

---

[1] The parties refer to Merrill Lynch's financial advisors as "FAs," but we find that acronym awkward, so we'll call them "brokers" instead.

42 U.S.C. § 2000e-2. The plaintiffs challenged a wide array of Merrill Lynch's employment policies and practices, alleging racial discrimination in hiring, compensation, account distribution, and "teaming" (the grouping of brokers that handle particular accounts).

A major theme of the *McReynolds I* litigation is the allegation that black brokers were systematically steered away from the most lucrative assignments and thus prevented from earning compensation comparable to their white counterparts. The case was assigned to Judge Robert Gettleman, and in 2010 he denied class certification. A panel of this court recently reversed that determination, *see McReynolds*, 672 F.3d at 492, and the litigation is ongoing.

Meanwhile, on September 15, 2008, Bank of America announced that it would acquire Merrill Lynch in a $50 billion all-stock merger. The transaction closed on January 1, 2009, and Merrill Lynch now operates as a wholly owned subsidiary of Bank of America. As part of the acquisition, the companies decided to pay retention-incentive bonuses to Merrill Lynch brokers based on each broker's production credits. Thus, brokers who had already been earning higher compensation for producing more business would be offered larger bonuses to remain with the firm through the acquisition.

In response to the retention plan, McReynolds and a group of black brokers filed the present suit, making this case "*McReynolds II*." The named plaintiffs in the two cases are substantially similar, though not identical; all the plaintiffs in this case are also plaintiffs in

*McReynolds I*, and the same law firm represents them. Merrill Lynch is a defendant in both cases, and Bank of America is also a defendant in this case.[2]

The *McReynolds II* complaint once again alleges two claims of racial discrimination—one under 42 U.S.C. § 1981 and one under Title VII—but the substantive focus is far more limited in that this suit challenges only the retention program.[3] In essence the plaintiffs allege that the pervasive past discrimination at Merrill Lynch resulted in production credits that reflected the effects of past discriminatory policies and practices. In turn, the use of production credits to determine retention bonuses amounted to an act of employment discrimination because it had the purpose and effect of depressing the size of bonuses earned by black brokers, or eliminating them altogether. The plaintiffs once again sought class certification.

The new suit was initially assigned to Judge Matthew Kennelly, and while class discovery was still underway, Merrill Lynch moved to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Judge Kennelly denied the motion, holding that the plaintiffs had adequately alleged that the retention plan was adopted with intent to discriminate. Merrill Lynch then filed an unopposed motion to transfer the case to Judge Gettleman,

---

[2] We will refer to the defendants collectively as "Merrill Lynch," unless the context requires otherwise.

[3] The version of the complaint at issue here is the plaintiffs' "First Amended Complaint," but we refer to it as simply "the complaint."

the presiding judge in *McReynolds I*. After the case was transferred, the Supreme Court decided *Iqbal*, which made it clear that the new pleading standards the Court had announced two years earlier in *Twombly* applied outside the antitrust context of *Twombly* itself. Based on *Iqbal*, Merrill Lynch renewed its motion to dismiss.

Judge Gettleman granted the motion. As a threshold matter, the judge opted to resolve the motion to dismiss before ruling on class certification, noting that a Rule 12(b)(6) motion "tests the sufficiency of the complaint, not the merits of the case." The judge then held that the retention program was a race-neutral production-based compensation system protected by § 703(h) and could be challenged only if it was adopted with *intent* to discriminate, not mere awareness that the program would disfavor black brokers based on the residual effects of past discrimination. The judge held that the complaint's allegations of intent to discriminate were nothing more than a "[t]hreadbare recital[] of the elements of the cause of action, supported by mere conclusory statements"—the kind of pleading the Supreme Court rejected in *Iqbal*. 556 U.S. at 678. To the extent that the production-credit "inputs" were themselves the product of discriminatory policies, the judge held that the new suit simply duplicated the litigation already underway in *McReynolds I*.

Finally, Judge Gettleman took note of a case in the Southern District of New York raising a nearly identical challenge to this same retention program, except that it alleged a claim of sex discrimination. *See Goodman v.*

*Merrill Lynch & Co.*, 716 F. Supp. 2d 253 (S.D.N.Y. 2010). The judge in *Goodman* had dismissed the plaintiffs' complaint, holding that Merrill Lynch's retention program was a production-based compensation system protected under § 703(h) and that the complaint failed to adequately allege intentional discrimination. *Id.* at 261-62.

## II. Discussion

We review a Rule 12(b)(6) dismissal de novo, construing the complaint in the light most favorable to the plaintiffs, accepting as true all well-pleaded facts, and drawing reasonable inferences in the plaintiffs' favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). The plaintiffs' primary argument is that the district court erred in concluding at the pleading stage that the retention-bonus program was a valid production-based compensation system shielded from challenge by § 703(h). They also maintain that dismissal was inconsistent with the Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, § 3, 123 Stat. 5 (codified at 42 U.S.C. § 2000e-5(e)(3)). Finally, they argue that the district court erroneously concluded that to the extent the allegations in the present complaint focus on Merrill Lynch's underlying discriminatory practices, they merely duplicate the claims in the *McReynolds I* litigation.[4]

---

[4] At the end of their opening brief, the plaintiffs also lodge a procedural objection to the district court's decision to address the dismissal motion ahead of class certification. Rule 23(c) of

(continued...)

<hr />

[4] (...continued)
the Federal Rules of Civil Procedure provides that the district court must address class certification "early" in the litigation and generally before addressing a motion directed at the merits. *See Bertrand v. Maram*, 495 F.3d 452, 455 (7th Cir. 2007). But there is no fixed requirement that the court must *always* defer a decision on a Rule 12(b)(6) motion until after the court addresses class certification. As the district court noted, a motion to dismiss for failure to state a claim tests the sufficiency of the complaint, and although a Rule 12(b)(6) dismissal operates as a final decision on the merits if leave to replead is not granted, it is sometimes appropriate to decide a Rule 12(b)(6) motion ahead of class certification. *See, e.g.,* *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 550 (2007) (affirming dismissal of antitrust claims prior to ruling on class certification); *Greenberger v. GEICO Gen. Ins. Co.,* 631 F.3d 392, 394-96 (7th Cir. 2011) (same); *Shlahtichman v. 1-800 Contacts, Inc.,* 615 F.3d 794, 797 (7th Cir. 2010) (same).

It was especially appropriate to do so here. As we will explain, this suit essentially piggybacks on *McReynolds I*, in which the same plaintiffs are challenging the various employment practices at Merrill Lynch that contribute to the determination of a broker's production credits. Those production credits, in turn, form the basis for the retention bonuses at issue here. Whether the retention-bonus program is insulated from challenge under § 703(h) is a threshold question that can be resolved on the pleadings. To the extent that the plaintiffs are really challenging the disparate impact of the underlying policies that provide the "inputs" for the bonuses, their claim here is subsumed within *McReynolds I*, and if successful, will be remedied there.

### A. Section 703(h)

The plaintiffs assert claims of racial discrimination under § 1981 and Title VII based on what the complaint describes as a long history of discriminatory employment policies and practices at Merrill Lynch that have the effect of denying black brokers the same business opportunities as white brokers. The complaint alleges that Merrill Lynch uses "production credits" to determine compensation, that these production credits reflect the effects of the underlying discrimination, and thus that the retention program, which paid bonuses based on production credits, was adopted with intent to discriminate against black brokers.

Section 703(h) of Title VII provides that certain compensation systems are exempt from challenge as an unlawful employment practice absent intent to discriminate:

> Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production . . . , provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin . . . .

42 U.S.C. § 2000e-2(h). The import of § 703(h) is that disparate racial *impact* is insufficient under Title VII to invalidate a "bona fide seniority or merit system," or a "system which measures earnings by quantity or quality

of production." Plaintiffs challenging an employment practice or compensation system of this type must establish *intent* to discriminate. *Patterson*, 456 U.S. at 65.

Section 703(h) thus creates an exception to the general rule that "a prima facie Title VII violation may be established by policies or practices that are neutral on their face and in intent but that nonetheless discriminate in effect against a particular group." *Teamsters*, 431 U.S. at 349. An employment practice that passes muster under Title VII does not violate § 1981, *Waters v. Wis. Steel Works of Int'l Harvester Co.*, 502 F.2d 1309, 1320 n.4 (7th Cir. 1974), so if the Merrill Lynch retention program is protected under § 703(h), then dismissal of both claims was proper.

### 1. *Production-Based Compensation System*

Our first question is whether the retention program qualifies as "a system which measures earnings by quantity or quality of production" within the meaning of § 703(h). The Supreme Court has more often interpreted and applied § 703(h) as it pertains to challenges to seniority and merit systems, but what the Court has said in those contexts guides the analysis here. The most relevant cases for our purposes are *Teamsters* and *Patterson*.

In *Teamsters* the Supreme Court held that a seniority system cannot be challenged under Title VII merely because it incorporates the effects of past acts of intentional discrimination. 431 U.S. at 353-54. The Court explained that employees who are the victims of intentional

discrimination after Title VII was enacted are entitled to retroactive seniority as a remedy for the violation, *id.* at 347-48 (citing *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 778-79 (1976)), but § 703(h) insulates the seniority system itself from challenge notwithstanding that the system locks in the effects of past discrimination, *id.*

The Court acknowledged that § 703(h) immunized only "bona fide" seniority systems in which differences in treatment were not "the result of an intention to discriminate because of race," but it declined to hold that any system that perpetuates the effects of past discrimination was not "bona fide" as a result. *Id.* at 353. Rather, the Court explained that the seniority system in *Teamsters* applied neutrally to all races and "did not have its genesis in racial discrimination," and was therefore a bona fide seniority system insulated from challenge under § 703(h). *Id.* at 355-56. *Patterson* reaffirmed the holding of *Teamsters* and clarified that § 703(h) applies equally to seniority systems adopted both before and after the passage of Title VII. 456 U.S. at 77.

Merrill Lynch argues, and we agree, that *Teamsters* and *Patterson* control the outcome here. The complaint alleges that retention bonuses are determined by production credits—"in essence, commissions earned on client assets managed by the [broker]"—and that the credits are "generated for the [brokers'] assets under management on the purchase or sale of certain investment products." The complaint further alleges that "[a]ssets under management reflect the total amount of clients' assets that a broker is responsible for managing

on the clients' behalf." As described in the complaint, the production-credit system is about as direct a measure of production as one could imagine in the financial-services industry, and the plaintiffs do not suggest otherwise.

The complaint likewise alleges that "compensation is largely determined by a 'grid' formula that applies different commission rates based on a[] [broker's] level of production" and that this formula is "neutral on [its] face." Nowhere does the complaint allege that the formula is actually *applied* in a discriminatory manner—only that the "inputs" determining a broker's production levels were themselves the products of past discrimination.

Taking these allegations as true, we have little trouble concluding that the retention-bonus program compensates brokers on the basis of production and that it does so in a race-neutral manner. To the extent that the program incorporated the effects of past discrimination, the same was true of the seniority system in *Teamsters*. Just as the *Teamsters* plaintiffs could obtain retroactive seniority as a remedy in a claim addressing the underlying discrimination, so too may the plaintiffs here obtain a remedy for any underlying discriminatory policies if they succeed in their challenge in *McReynolds I*. Stated differently, to whatever extent the plaintiffs can prove they would have received larger bonuses but for the past discrimination affecting their production levels, that loss may be incorporated into the remedy in *McReynolds I*. But the retention program itself is

shielded from challenge as a production-based compensation system under § 703(h).

The plaintiffs have several arguments as to why *Teamsters* should not control, but none are ultimately persuasive. First, they rely on a line of cases holding that a compensation scheme is not protected under § 703(h) if it does not actually measure what it purports to measure. *See, e.g.*, *Griggs v. Duke Power Co.*, 401 U.S. 424, 434-36 (1971) (holding that § 703(h) does not protect use of testing requirements with a disparate impact on racial minorities where the tests were not shown to be related to job performance); *Ass'n Against Discrimination in Emp't v. City of Bridgeport*, 647 F.2d 256, 272-74 (2d Cir. 1981) (racially discriminatory test that did not actually measure fitness for the job could not be characterized as a "bona fide merit system" under § 703(h)). The plaintiffs contend that just as the tests in *Griggs* and *Association Against Discrimination* were not really measuring merit, neither is the retention-bonus program really measuring the quality of production.

This comparison does not hold up under scrutiny. The material point in *Griggs* and *Association Against Discrimination* was that the testing devices at issue in those cases were not validly measuring employees' merit to begin with and were only serving to create racial disparities. *See Griggs*, 401 U.S. at 431 ("[N]either the high school completion requirement nor the general intelligence test is shown to bear a demonstrable relationship to successful performance of the jobs for which it was used."); *Ass'n Against Discrimination*, 647 F.2d at

273 ("[I]t would defy reason to characterize as a 'bona fide merit system' a test that does not measure the fitness of those who take it for the positions to be filled according to its results."). This case is quite different. The complaint itself acknowledges that a broker's production credits do, in fact, reflect "commissions earned on client assets managed by the [broker]," and there is no suggestion that this metric of production is improper. It is also undisputed that brokers who more successfully invest their assets under management earn more production credits and that this calculation is made on an objective and racially neutral basis. In short, a broker's production credits—on which the retention bonuses were based—do in fact measure the "quality of production" as required for the § 703(h) exemption.

This might be a different case if a broker's compensation depended on a subjective analysis of how effectively the broker was representing the firm. If, for example, black brokers were receiving systematically poorer reviews than their white counterparts who performed substantially similar work, and the reviews determined compensation, then Merrill Lynch could not shield the system simply by calling it a merit- or production-based system—or at least, the § 703(h) issue could not be resolved at the pleading stage. In that situation, the challenger might have an arguable factual basis for a claim under *Griggs* that the evaluations were not actually measuring production. But here, the complaint alleges that the retention-bonus program applies equally to all brokers and uses an objective, mechanical measure of productivity, avoiding any subjective evaluations.

The plaintiffs also argue that § 703(h) should apply only to "piecework" production systems, like the manufacture of physical products on an assembly line, and not the sort of financial-asset production-credit system at issue here. This reading of the statute has no basis in the text and is not compelled by relevant precedent. Section 703(h) states that "it shall not be an unlawful employment practice for an employer to apply different standards of compensation . . . pursuant to . . . a system which measures earnings by quantity or quality of production." This language is not limited to piecework systems; indeed, the specific use of the phrase "quantity *or quality*" plainly expands the reach of § 703(h) beyond quantity-based piecework compensation systems. The plaintiffs point out that where production-based systems are discussed in the legislative history of § 703(h), only piecework systems are mentioned as an example. Consulting legislative history may be an acceptable means of decoding an ambiguous statute, *see DIRECTV, Inc. v. Barczewski*, 604 F.3d 1004, 1008 (7th Cir. 2010), but the text of § 703(h) is not ambiguous in any relevant respect. It broadly exempts compensation systems based on quantity *or* quality of production.

Next, the plaintiffs contend that even if the retention program qualifies as a production-based system, it is not "bona fide" as that term is used in § 703(h). *See* 42 U.S.C. § 2000e-2(h) ("[I]t shall not be an unlawful employment practice for an employer to apply different standards of compensation . . . pursuant to a *bona fide* seniority or merit system, or a system which measures earnings by quantity or quality of production . . . ." (emphasis added)).

The statute itself does not explain what is meant by "bona fide," but in *Teamsters* the Supreme Court elaborated on the term in the context of a seniority system:

> The seniority system in this litigation is entirely bona fide. It applies equally to all races and ethnic groups. To the extent that it "locks" employees into non-line-driver jobs, it does so for all. The [injured employees] . . . are not all Negroes or Spanish-surnamed Americans; to the contrary, the overwhelming majority are white. The placing of line drivers in a separate bargaining unit from other employees is rational in accord with the industry practice . . . . It is conceded that the seniority system did not have its genesis in racial discrimination, and that it was negotiated and has been maintained free from any illegal purpose.

431 U.S. at 355-56. The plaintiffs maintain that although the retention program is racially neutral on its face, it cannot be considered "bona fide" because the production-credit system on which it is based had its genesis in Merrill Lynch's discriminatory policies and practices and was neither negotiated nor maintained free from illegal purpose.

We do not need to grapple with the question whether the term "bona fide" has some specialized meaning in this context.[5] On the most straightforward reading of the statute, the "bona fide" modifier applies to seniority

---

[5]  A standard definition of "bona fide" is: "1. Made in good faith; without fraud or deceit. 2. Sincere; genuine." BLACK'S LAW DICTIONARY 199 (9th ed. 2004).

and merit systems, not to production-based compensation systems. To repeat, the statute provides that "it shall not be an unlawful employment practice for an employer to apply different standards of compensation . . . pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production." If the "bona fide" modifier were meant to apply to production-based systems as well as seniority and merit systems, the more natural phrasing would authorize employers to use different standards of compensation "pursuant to a bona fide seniority system, merit system, or system which measures earnings by quantity or quality of production."[6]

The interpretive question is largely irrelevant, however, because even if the "bona fide" modifier applies, the concept is inherently built into what it means for a system to measure quantity or quality of production.

---

[6] We have not been able to find any case that has squarely addressed this interpretive question. The plaintiffs cite *Beasley v. Kroehler Manufacturing Co.*, 406 F. Supp. 926, 928-29 (N.D. Tex. 1976), for the proposition that "a production system must be shown to measure the actual quantity or quality of the employee's production—without employer manipulation—before it qualifies as bona fide." But *Beasley* says nothing of the sort—indeed, the court went so far as to quote § 703(h) as *excluding* the bona fide language as applied to production-based compensation systems. *See id.* ("Title VII specifically provides that 'it shall not be an unlawful employment practice for an employer to apply different standards of compensation . . . pursuant to a . . . quantity or quality of production[.]' 42 U.S.C. § 2000e-2(h)." (alterations in original)).

Indeed, the "bona fide" question is essentially identical to the question whether the retention-bonus program is, in fact, a production-based system. If there were truly a dispute as to whether the retention program measured production—as would be the case in the "subjective analysis" hypothetical discussed above—then perhaps it could be said that the retention program was not "bona fide." But as we have explained, the retention program qualifies as a production-based system, so any extra "bona fide" analysis is beside the point.

Finally, when the Supreme Court explained why the seniority system in *Teamsters* was "entirely bona fide," 431 U.S. at 355, it did so in language that distinguished a bona fide seniority system from one adopted as a "result of an intention to discriminate." The Court observed that the seniority system qualified as "bona fide" in part because it "did not have its genesis in racial discrimination" and was "negotiated and . . . maintained free from any illegal purpose." *Id.* at 356. This anticipates the next step in the § 703(h) analysis, which concerns the issue of discriminatory intent.

## 2. *Intent to Discriminate*

Because it qualifies as a production-based compensation system, the retention program is exempt from challenge under § 703(h) *provided* it was "not the result of an intention to discriminate because of race." As an initial matter, the plaintiffs argue that even if the retention program itself was not adopted with a discriminatory purpose, it was based on production levels that re-

flected the effects of past intentional discrimination, so the actual differences in bonus pay resulted from an intention to discriminate, if only indirectly. This argument relies on a misreading of the statutory language. Appropriately excerpted, § 703(h) provides that "it shall not be an unlawful employment practice . . . to apply different standards of compensation . . . provided that such differences are not the result of an intention to discriminate." The phrase "such differences" in the proviso refers back to "*standards* of compensation," not the actual amount of compensation.

*Teamsters* confirms this understanding of the statute. There, it was conceded that the differences in seniority (and thus the differences in employment privileges) were the product of intentional discrimination, but the seniority system itself was nevertheless immune from challenge under § 703(h). The plaintiffs suggest that production-based systems should be treated differently from seniority systems, but nothing in the text of the statute or the Court's analysis in *Teamsters* supports limiting that case to its facts. The proviso applies across the board. By its terms, § 703(h) authorizes employers to apply different standards of compensation pursuant to a seniority, merit, or production-based system *provided* that the system was not adopted with a discriminatory purpose. Although *Teamsters* addressed a seniority system, the Court's interpretation of § 703(h) applies with

equal force here.[7] A production-based compensation system, like a seniority or merit system, forfeits the protection of § 703(h) only if the system itself was adopted with the intent to discriminate.

The complaint alleges this intent, but it does so only generally, raising the question whether the allegations pass muster under the heightened pleading standards set forth in *Twombly* and *Iqbal*. To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement

---

[7] The EEOC, as an amicus for the plaintiffs, suggests an odd distinction between *Teamsters* and the present case. The agency argues that *Teamsters* involved "discrete acts of discrimination that had immediate and tangible adverse effects on the plaintiffs but were not challenged at the time," but in this case, "the disparity in compensation under the [retention program] was the first tangible consequence of the discriminatory allocation of accounts and other benefits." Setting aside whether this distinction is valid in theory, the argument cannot be squared with the complaint, which asserts that Merrill Lynch's underlying discriminatory policies had a disparate impact on brokers' wages well before the acquisition by Bank of America, and that those policies are the subject of litigation in *McReynolds I*.

to relief.' " *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

*Iqbal* clarified two working principles underlying the *Twombly* decision. First, although the complaint's factual allegations are accepted as true at the pleading stage, allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion. *Id.* Accordingly, "[t]hreadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice." *Id.* Second, the plausibility standard calls for a "context-specific" inquiry that requires the court "to draw on its judicial experience and common sense." *Id.* at 679. This is "not akin to a 'probability requirement,' " but the plaintiff must allege "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678.

Applying these principles here, the allegations that Merrill Lynch knew that the production-credit system had a disparate impact on black brokers are legally insufficient. Instead, the complaint must allege enough factual content to support an inference that *the retention program itself* was adopted *because of* its adverse effects on black brokers. *See Iqbal*, 556 U.S. at 676-77; *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

The plaintiffs suggest that reliance on *Iqbal* and *Feeney* is misplaced because those cases concerned constitutional claims, not statutory claims. The distinction makes no difference. It is well-established that an intentional-discrimination claim under Title VII is evalu-

ated the same way as an intentional-discrimination claim arising under the Equal Protection Clause:

> Neither [*Washington v.*] *Davis* nor [*Personnel Administrator v.*] *Feeney* were Title VII cases, a point emphasized in *Davis*. But when intentional discrimination is charged under Title VII[,] the inquiry is the same as in an equal protection case. The difference between the statutory and constitutional prohibitions becomes important only when a practice is challenged . . . based on a theory of "disparate impact," as distinct from "disparate treatment" . . . .

*Am. Nurses' Ass'n v. Illinois*, 783 F.2d 716, 722 (7th Cir. 1986) (citation omitted); *see also EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1273 (11th Cir. 2000) ("[T]o show discriminatory intent [under Title VII], a plaintiff must demonstrate 'that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects on an identifiable group.' " (alteration in original) (quoting *Feeney*, 442 U.S. at 279) (internal quotation marks omitted)). By operation of § 703(h), both the Title VII and § 1981 claims require a showing of intentional discrimination, so *Iqbal* and *Feeney* provide the proper decisional framework.

The complaint alleges in some detail that black brokers at Merrill Lynch have been the victims of discriminatory employment policies and practices and that they receive fewer production credits as a result. But much less is said about the retention program itself. The complaint alleges that the retention awards

were "based on annualized production credits through September 2008," that the awards for black brokers "were lower than they would have been absent unlawful discrimination," and that both Merrill Lynch and Bank of America were aware of this differential and the under-lying discriminatory practices that allegedly caused it. As to whether the retention program itself was adopted with discriminatory purpose, however, the complaint asserts only the following:

> Defendants intentionally designed and implemented retention bonuses based largely on production credits that had a disparate impact on and intention-ally discriminated against African Americans and women. Defendants identified and selected for higher compensation the FAs they would try hardest to retain via the retention bonuses, and they knew that they were offering more generous retention packages to white men than to African Americans and women. Simply put, Defendants intended to retain and more generously compensate white men rather than African Americans and women. Defen-dants did not want to retain African American FAs, and have engaged in policies and practices designed to further their higher rates of attrition.

We agree with the district court that these allegations of intent are the sort of conclusory allegations that are insufficient under *Iqbal*. All four sentences say basically the same thing and at roughly the same level of general-ity—that Merrill Lynch intentionally designed the re-tention program based on production levels that incorpo-

rated the effects of past discrimination, and that the firm did so with the intent to discriminate against black brokers. Stated as such, the assertion is merely a conclusion, unsupported by the necessary *factual* allegations to support a reasonable inference of discriminatory intent. *Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). Indeed, it is helpful to compare this language to the rejected complaint in *Iqbal* itself, which alleged that the defendants "knew of, condoned, and willfully and maliciously agreed to subject [the plaintiff] to harsh conditions of confinement as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest." *Id.* at 680 (internal quotation marks omitted).

The plaintiffs argue that the complaint adequately alleges intentional discrimination but the district court erroneously rejected the allegations as "implausible" by drawing two improper inferences: first, that the true motive of the retention program was to retain the most productive brokers; and second, that Bank of America would have wanted to avoid discrimination to prevent a lawsuit. Had the complaint adequately alleged intentional discrimination in the first place, this might be a valid point. The "plausibility" standard under *Iqbal* "does not imply that the district court should decide whose version to believe, or which version is more likely than not." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). But the complaint did *not* adequately allege intentional discrimination in the

first place. The district court recognized as much, holding that the plaintiffs offered nothing more than conclusory allegations of discriminatory intent.

In any event, our standard of review is de novo, and based on our own review of the complaint, we conclude that it contains insufficient factual content to support an inference that the *retention program itself* was intentionally discriminatory. The plaintiffs have alleged that Merrill Lynch's past employment practices had discriminatory effects on black brokers and the firm knew it when it designed the retention program. But however ample the complaint's allegations might be to support a disparate-impact claim vis-à-vis the underlying employment practices, they are insufficient to support a claim of intentional discrimination *with respect to the retention program*. Under *Teamsters* the past discriminatory "inputs" are legally irrelevant to the lawfulness of the retention program. The complaint needs to allege some facts tending to support a plausible inference that the retention program *itself* was adopted for a discriminatory purpose.

The complaint contains no factual allegations of this nature. It alleges only that Merrill Lynch was aware of the disparate impact of its policies on black brokers and then asserts in wholly conclusory terms that this impact was the purpose of the retention program. Under a combined reading of *Teamsters* and *Iqbal*, these allegations are legally insufficient to state a claim. This is a complex discrimination claim, and we have observed that under *Iqbal* and *Twombly*, "[t]he required level of factual specific-

ity rises with the complexity of the claim." *McCauley v. City of Chicago*, 671 F.3d 611, 616-17 (7th Cir. 2011) (citing *Swanson*, 614 F.3d at 405). Because the complaint contains only conclusory allegations that the retention program was adopted with intent to discriminate, it fails to state a claim upon which relief may be granted.

## B. Lilly Ledbetter Fair Pay Act

The plaintiffs also argue that dismissal was improper under the Lilly Ledbetter Fair Pay Act of 2009, which they claim creates a new cause of action for discriminatory practices whenever compensation is paid pursuant to past discriminatory employment decisions. They argue, in essence, that a new cause of action was created when Merrill Lynch paid the retention bonuses, taking this case outside the ambit of § 703(h). This argument completely misunderstands the Fair Pay Act.

The Act was passed following the Supreme Court's decision in *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618 (2009), which held that Title VII's 180-day statute of limitations begins to run when a discriminatory pay decision is made, not each time compensation is paid, *id.* at 632. Lilly Ledbetter filed suit within 180 days of receiving a paycheck reflecting an allegedly discriminatory wage, but the employment decisions that caused the claimed disparity in pay occurred much earlier. The Court held that the limitations period began to run at the time the discriminatory employment decisions were made, not each time a paycheck was issued. *Id.* at 627-28.

In response to this decision, Congress passed the Fair Pay Act, which provides as follows:

> For purposes of this section, an unlawful employment practice occurs, with respect to discrimination in compensation in violation of this title, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.

42 U.S.C. § 2000e-5(e)(3)(A). The statute thus reverses the decision in *Ledbetter* and clarifies that an unlawful employment practice occurs for purposes of the statute of limitations "each time . . . compensation is paid, resulting in whole or in part from [an unlawful employment] decision or other practice."

The Act therefore concerns the question of *timing*—it affects *when* discriminatory practices may be challenged by extending the statute of limitations every time a paycheck is issued. It is an accrual rule; it does not affect the substance of the claim. Indeed, in *AT & T Corp. v. Hulteen*, 556 U.S. 701, 715-16 (2009), the Supreme Court specifically held that § 703(h), as interpreted in *Teamsters*, survived the Fair Pay Act. *Hulteen* held that a bona fide seniority system was protected by § 703(h) even though it did not retroactively equalize pregnancy leaves taken before the passage of the Pregnancy Discrimination Act ("PDA"). *Id.* at 704-06. The Court thus applied *Team-*

*sters* in the context of pregnancy discrimination. In holding that the Fair Pay Act did not affect its decision, the Court noted that "AT & T's pre-PDA decision not to award Hulteen service credit for pregnancy leave was not discriminatory, with the consequence that Hulteen has not been 'affected by application of a discriminatory compensation decision or other practice.'" *Id.* at 716 (quoting 42 U.S.C. § 2000e-5(e)(3)(A)). In other words, by virtue of § 703(h), the employer had not, in fact, committed an unlawful employment practice, so there was no way that future payments could have "continued" this nonexistent discrimination.

The same is true here. The plaintiffs have challenged only the retention program, but the program is immune from challenge as a race-neutral production-based compensation system under § 703(h). As such, there is no Title VII violation in the first place, so it makes no sense to say that the payment of bonus awards extended the statute of limitations. What the Fair Pay Act *would* do, if applicable here, is allow the plaintiffs another chance to challenge Merrill Lynch's underlying discriminatory practices if the statute of limitations had run on those claims. But the plaintiffs are *already* challenging those practices in *McReynolds I*, so the Fair Pay Act simply has no role to play in this litigation.

### C. Construing the Complaint as a Challenge to Underlying Discriminatory Practices

Finally, the plaintiffs argue that even if the retention program itself is protected, the complaint should be

construed as a challenge to the underlying discriminatory practices at Merrill Lynch—about which there are many detailed allegations in the complaint—and the district court therefore should not have dismissed the suit as duplicative of the claims made in *McReynolds I*.[8] This argument would be difficult to win under any circumstances, and it is especially weak here. The district court has broad discretion to dismiss a complaint "'for reasons of wise judicial administration . . . whenever it is duplicative of a parallel action already pending in another federal court.'" *Serlin v. Arthur Andersen & Co.*, 3 F.3d 221, 223 (7th Cir. 1993) (quoting *Ridge Gold Standard Liquors, Inc. v. Joseph E. Seagram & Sons, Inc.*, 572 F. Supp. 1210, 1213 (N.D. Ill. 1983)). A suit is duplicative if the "claims, parties, and available relief do not significantly differ between the two actions." *Ridge Gold*, 572 F. Supp. at 1213. The district court has significant latitude on this question, and we will reverse only for abuse of discretion. *Serlin*, 3 F.3d at 223.

Application of that standard here is quite straightforward. All of the named plaintiffs in this case are also plaintiffs in *McReynolds I*, and the *McReynolds I* litigation challenges the underlying employment practices that are alleged to have caused differences in brokers' production credits, and by extension in the retention awards.

---

[8] Merrill Lynch maintains that the plaintiffs waived this argument by failing to make it in the district court. To the contrary, the plaintiffs specifically raised this argument in their brief in response to the motion to dismiss.

The plaintiffs will be able to obtain complete relief in *McReynolds I* because any loss relating to reduced retention awards based on lower production credits can simply be treated as part of the damages in that case should the plaintiffs prevail on the merits.

The plaintiffs insist that because the class and the claims are broader in *McReynolds I*, and Bank of America is named as a defendant here but not in the earlier case, the two actions are sufficiently different to proceed as independent actions. We disagree. The larger class size and broader scope of the claims in *McReynolds I* actually *support* the district court's holding that any challenge to Merrill Lynch's underlying employment practices here is subsumed in the earlier case. And to the extent that Bank of America may be liable as a corporate parent, the plaintiffs can try to amend their complaint in *McReynolds I* to add Bank of America as a defendant. *See EEOC v. Vucitech*, 842 F.2d 936, 944 (7th Cir. 1988); *see also Worth v. Tyer*, 276 F.3d 249, 259-60 (7th Cir. 2001) ("'When the successor company knows about its predecessor's liability, knows the precise extent of that liability, and knows that the predecessor itself would not be able to pay a judgment obtained against it, the presumption should be in favor of successor liability . . . .'" (quoting *Vucitech*, 842 F.2d at 945)). But allowing a separate suit seeking the same remedy would be redundant.

Finally, the plaintiffs make the curious assertion that dismissal would "eliminate[] the role of the [EEOC] in investigating employment discrimination claims against employers that repeatedly commit 'similar or related'

discriminatory acts." The argument seems to be that the district court's refusal to entertain this duplicative lawsuit will somehow discourage potential plaintiffs from filing charges with the EEOC and thus prevent the agency from adequately investigating long-standing discriminatory practices. We see no such disincentive. Plaintiffs may always file *new* claims with the EEOC. Dismissal here simply reflects the district court's conclusion that if the complaint in this case is construed as a challenge to Merrill Lynch's underlying discriminatory practices, there are not, in fact, any *new* claims being made—only the potential for greater damages in the earlier suit. This conclusion was not an abuse of discretion.[9]

AFFIRMED.

---

[9] In their reply brief, the plaintiffs also argue that the case should have been stayed rather than dismissed. *See Gleash v. Yuswak*, 308 F.3d 758, 760 (7th Cir. 2002) ("Even when prudence calls for putting a redundant suit on hold, it must be stayed rather than dismissed unless there is no possibility of prejudice to the plaintiff."). Arguments raised for the first time in a reply brief are waived. *See Mendez v. Perla Dental*, 646 F.3d 420, 423-24 (7th Cir. 2011). Moreover, we doubt that the decision to dismiss rather than stay this case could have possibly prejudiced the plaintiffs. As we have noted, to the extent that they prevail on their claims in *McReynolds I*, the plaintiffs will have a complete remedy.